**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ANDREW B.,

      *Plaintiff,*

v.

COMMISSIONER OF SOCIAL
SECURITY,

      *Defendant.*

_____/

Case No. 2:25-cv-13300

Robert J. White
United States District Judge

Patricia T. Morris
United States Magistrate Judge

**REPORT AND RECOMMENDATION ON**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 12, 15)**

**I.     RECOMMENDATION**

For the reasons set forth below, it is recommended Plaintiff's motion for summary judgment (ECF No. 12) be **DENIED**, Defendant Commissioner of Social Security's motion for summary judgment (ECF No. 15) be **GRANTED**, and the final decision of the Administrative Law Judge (ALJ) be **AFFIRMED**.

**II.    REPORT**

    **A.     Introduction and Procedural History**

On August 1, 2022, Plaintiff filed an application for Supplemental Security Income, alleging he became disabled on January 15, 2022.  (ECF No. 9-1, PageID.40).  The Commissioner initially denied the application on June 5, 2023, and

1

on reconsideration on January 16, 2024.  (*Id.*).  Plaintiff then requested a hearing before an ALJ, which was held on August 8, 2024.  (*Id.* at PageID.40, 55–83).  The ALJ issued a written decision on September 27, 2024, finding Plaintiff was not disabled.  (*Id.* at PageID.40–50).  Following the ALJ's decision, Plaintiff requested review from the Appeals Council, which denied the request on August 18, 2025.  (*Id.* at PageID.31–33).

Following the denial of review, Plaintiff sought judicial review on October 18, 2025.  (ECF No. 1).  The parties filed cross-motions for summary judgment and briefing is complete.  (ECF Nos. 12, 15, 16).

**B.    Standard of Review**

District courts have jurisdiction to review the Commissioner's final administrative decisions pursuant to 42 U.S.C. § 405(g).  The review is restricted solely to determining whether "the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record."  *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (citation modified).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citation modified).  "[T]he threshold for such evidentiary sufficiency is not high."  *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019).  "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to

2

support a conclusion." *Id.* (citation modified).

A district court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). Courts will "not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). "If the [Commissioner's] decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* (citation modified).

### C.    Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, [the ALJ] consider[s] [the claimant's] work activity, if any. If [the claimant is] doing substantial gainful activity, [the ALJ]

will find that [the claimant is] not disabled.

(ii) At the second step, [the ALJ] consider[s] the medical severity of [the claimant's] impairment(s).  If [the claimant] do[es] not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, [the ALJ] will find that [the claimant is] not disabled.

(iii) At the third step, [the ALJ] also consider[s] the medical severity of [the claimant's] impairment(s).  If [the claimant has] an impairment(s) that meets or equals one of [the] listings in appendix 1 of this subpart and meets the duration requirement, [the ALJ] will find that [the claimant is] disabled.

(iv) At the fourth step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . past relevant work. If [the claimant] can still do . . . past relevant work, [the ALJ] will find that [the claimant is] not disabled.

(v) At the fifth and last step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . age, education, and work experience to see if [the claimant] can make an adjustment to other work.  If [the claimant] can make an adjustment to other work, [the ALJ] will find that [the claimant is] not disabled.  If [the claimant] cannot make an adjustment to other work, [the ALJ] will find that [the claimant is] disabled.

20 C.F.R. § 404.1520(4); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534

(6th Cir. 2001).

"Through step four, the claimant bears the burden of proving the existence

and severity of limitations caused by [his or] her impairments and the fact that [he

or] she is precluded from performing [his or] her past relevant work." *Jones v.

Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).  The claimant must provide

evidence establishing his or her residual functional capacity (RFC), which "is the most [the claimant] can still do despite [his or her] limitations," and is assessed using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 214 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ determined Plaintiff was not disabled. (ECF No. 9-1, PageID.50). At Step One, the ALJ found Plaintiff had not engaged in substantial gainful activity since August 1, 2022, the application date. (*Id.* at PageID.42). At Step Two, the ALJ found the following impairments severe: schizoaffective disorder; social anxiety; and bipolar 1 disorder. (*Id.*).

At Step Three, the ALJ found none of the impairments, either independently or in combination, met or medically equaled in severity or duration the criteria of any listing. (*Id.* at PageID.42–44).

Next, the ALJ found Plaintiff had the RFC

> to perform a full range of work at all exertional levels but with the following nonexertional limitations: Can understand, remember and carry out simple instructions and perform tasks that do not involve a specific production rate pace, such as assembly line work or an hourly production quota, and would thus be unable to learn tasks that required instruction beyond a short demonstration up to and including 1 month to learn, and would be limited to applying commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form and deal with problems involving several concrete variables in or from standardized situations.  Able to perform simple work-related decisions.  Able to interact with supervisors occasionally; able to interact with coworkers occasionally; never able to interact with the public.  Able to tolerate occasional changes in the routine work setting.

(*Id.* at PageID.44).

At Step Four, the ALJ found Plaintiff was able to perform past relevant work as a stocker/truck driver helper.  (*Id.* at PageID.48–49).  In addition, the ALJ found other jobs in the national economy that Plaintiff could perform.  (*Id.* at PageID.49).  Specifically, the ALJ found Plaintiff could perform the requirements of a hand packager (42,000 jobs in the national economy), a routing clerk (45,000), and an inspector hand packager (39,000).  (*Id.* at PageID.49–50).  The ALJ thus concluded Plaintiff was "not disabled."  (*Id.* at PageID.50).

### E.    Administrative Record

Plaintiff raises three issues on appeal.  First, Plaintiff argues the ALJ did not properly consider whether his impairments met or equaled Listing 12.03.  Second, Plaintiff argues the ALJ improperly discounted his doctor's medical opinion.  Third,

6

Plaintiff argues the ALJ improperly evaluated his RFC.  While the Undersigned has reviewed the entire record, she will only summarize the evidence relevant to Plaintiff's issues on appeal.

Plaintiff has been diagnosed with bipolar disorder and schizophrenia.  (ECF No. 9-1, PageID.1063).  In March 2020, before the date Plaintiff claimed disability, he was hospitalized for six days after being found naked in his neighbor's yard. (ECF No. 9-2, PageID.2113).  In May, he was brought back to the hospital by police "for bizarre behavior, insomnia, and agitation in the context of cannabis use and medication noncompliance."  (*Id.* at PageID.1137).  He improved after taking prescribed medications.  (*Id.* at PageID.2113).

Plaintiff again became noncompliant on his medication in November 2021, but "fe[lt] better" and remained symptom free at an appointment in January 2022. (*Id.* at PageID.1137, 2112).  He reported he was ready to get back to work and had started learning computer programming.  (*Id.* at PageID.2112).  He was visiting friends, writing music, and playing guitar and piano.  (*Id.*).

By March 2022, he had decompensated again and was admitted to the hospital due to bizarre and manic behavior "in the context of recent cannabis use and discontinued psychotropic medications."  (*Id.* at PageID.1136, 2112).  Plaintiff was

7

catatonic and underwent electroconvulsive therapy.[1] (ECF No. 9-1, PageID.430–978). Plaintiff appeared to be improving by session number 11. (*Id.* at PageID.598). By session 12, Plaintiff appeared mildly brighter and was conversing meaningfully. (*Id.* at PageID.692). Upon the sixteenth session, Plaintiff reported feeling much better and appeared brighter with good eye contact. (*Id.* at PageID.714). Plaintiff's mother noticed remarkable improvements by session 17. (*Id.* at PageID.716). No catatonic symptoms were noted by session 20. (*Id.* at PageID.887). Ultimately, electroconvulsive therapy "showed significant improvement on [Plaintiff's] psychosis and catatonia" and he was also given Clozapine which improved his symptoms. (*Id.* at PageID.625). He continued to follow up as necessary after discharge, and his symptoms remained better and stable. (*See, e.g.*, *id.* at PageID.1078).

Upon discharge, Plaintiff was compliant with his medication and reported being stable and being more active, including walking daily and helping with chores. (*Id.* at PageID.2112). In March 2023, Plaintiff was still working on his music. (*Id.* at PageID.1698). In July, he was free of paranoia and delusions and reported planning on job hunting after he got a new car. (*Id.* at PageID.2129). In August,

---

[1] Electroconvulsive therapy is a procedure in which small electric currents are passed through the brain to change brain chemistry. The procedure is generally performed 6–12 times but may increase depending on how quickly symptoms are improving. Electroconvulsive Therapy (ECT), https://www.mayoclinic.org/tests-procedures/electroconvulsive-therapy/about/pac-20393894 (last updated May 30, 2024).

Plaintiff was still stable and compliant with his medication without any reported side effects.  (*Id.*).  He was staying busy with chores and teaching himself programming but remained isolative, only meeting with friends occasionally.  (*Id.*).

In April 2023, Plaintiff filled out a function report.  (*Id.* at PageID.263–71).  He described his typical day: exercise, breakfast, shower, chores, practice computer programming, and hobbies like writing music.  (*Id.* at PageID.264).  He acknowledged he had no problems with personal care, grooming, taking his medications, doing house work such as laundry, dishes, and mowing, and handling money. (*Id.* at PageID.264–66).  He also went for daily walks when the weather was good.  (*Id.* at PageID.266).  He explained that it had been harder to focus when writing music or programming since his hospitalizations.  (*Id.* at PageID.267).  He also detailed going to friends' houses "semi-frequently" for game nights "[e]very 2 weeks or so—I am somewhat quiet socially."  (*Id.*).  He felt he did not manage stress well due to his mental issues becoming aggravated by stress and that it takes some time, "a bit of a struggle," to handle changes in his routine.  (*Id.* at PageID.269).  Plaintiff filled out a similar function report in September with several notable changes; it appears he started taking care of a dog and cooking more of his meals. (*Id.* at PageID.281–88).

Plaintiff's treating mental health provider, Gianina Cristi, NP, completed a questionnaire about Plaintiff's mental health in September 2023.  (*Id.* at

PageID.2223–27). She described Plaintiff's 2022 hospitalization but noted that he was stable when he was on medications. (*Id.* at PageID.2224). Cristi noted that he was independent with self-care, helped with chores at home, and had a few friends but was generally reluctant to leave his house. (*Id.*). She also noted he has been stable since living with his family and that his last hospitalization was due to medication noncompliance, living alone, and using alcohol and marijuana. (*Id.*). Cristi opined Plaintiff was only moderately limited in most capacities but was markedly limited in his ability to maintain attention and concentration for extended periods; to work in coordination with or proximity to others without being distracted by them; to interact appropriately with the general public; to be aware of normal hazards and take appropriate precautions; and to set realistic goals or make plans independently of others. (*Id.* at PageID.2227). She also opined Plaintiff had a residual disease process resulting in marginal adjustment due to poor concentration and focus, social isolation, and being "generally more guarded around people." (*Id.* at PageID.2225). In addition, she felt Plaintiff had an inability to function outside of a highly supportive living arrangement because he had been stable while living with family and the last time he had decompensated was due to medication noncompliance, living alone, and using alcohol and marijuana. (*Id.*). Further facts will be discussed below as necessary.

  **F. Governing Law**

10

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources, and nonmedical sources. An acceptable medical source means a medical source who is a:

(1) Licensed physician (medical or osteopathic doctor);

(2) Licensed psychologist, which includes:

    (i) A licensed or certified psychologist at the independent practice level; or

    (ii) A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

11

(5) Qualified speech-language pathologist for speech or language impairments only.  For this source, *qualified* means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language Pathology from the American Speech-Language-Hearing Association;

(6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only . . . ;

(7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice . . . ; or

(8) Licensed Physician Assistant for impairments within his or her licensed scope of practice . . . .

20 C.F.R. § 404.1502(a) (2021).  A medical source is

an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law.

*Id.* § 404.1502(d).  In contrast, a nonmedical source is "a source of evidence who is not a medical source."  *Id.* § 404.1502(e).  "This includes, but is not limited to: (1) [the claimant];  (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy."  *Id.*

The Social Security Administration (SSA) "will not defer or give any specific

12

evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." *Id.* § 404.1520c(a). "The most important factors [the SSA] consider[s] when evaluat[ing] the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.* § 404.1520c(c).

The first factor is "supportability." For this factor, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the opinion. In essence, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the source's "[r]elationship with the claimant." *Id*. § 404.1520c(c)(3). This factor includes analysis of:

13

(i)     Length of the treatment relationship.  The length of time a medical source has treated [the claimant] may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);

(ii)    Frequency of examinations.  The frequency of [the claimant's] visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);

(iii)   Purpose of the treatment relationship.  The purpose for treatment [the claimant] received from the medical source may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);

(iv)    Extent of the treatment relationship.  The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);

(v)     Examining relationship.  A medical source may have a better understanding of [the claimant's] impairment(s) if he or she examines [the claimant] than if the medical source only reviews evidence in [the claimant's] folder.

*Id.*

The fourth factor of the SSA's analysis is "specialization."  In making this determination, the SSA will consider

[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.

*Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors."  These may include any other information that "tend[s] to support or contradict a medical opinion or prior administrative medical finding."  *Id.* § 404.1520c(c)(5).  Other factors include "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements."  *Id.*  Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, [it] will also consider whether new evidence [it] receive[s] after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive."  *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements."  The ALJ will consider "source-level articulation."  Pursuant to this requirement,

> [b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record.  Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate.

*Id.* § 404.1520c(b)(1).  The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors [the SSA] consider[s] when [it] determine[s] how persuasive [it] find[s] a medical source's medical opinions or prior administrative medical findings to be." *Id.* § 404.1520c(b)(2).  As such, the SSA

> will explain how [it] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [the claimant's] determination or decision.  [The SSA] may, but [is] not required to, explain how [it] considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when [it] articulate[s] how [it] consider[s] medical opinions and prior administrative medical findings in [the claimant's] case record.

*Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported," and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors . . . for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3).  The regulations clarify that the SSA is "not required to articulate how [it] considered evidence from nonmedical sources using the requirements of

16

paragraphs (a)–(c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how [it] considered such evidence in [its] determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities"; "[d]isability examiner findings," meaning "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate determination about whether [the claimant is] disabled"; and "[s]tatements on issues reserved to the Commissioner[,]" including

(i)     Statements that [the claimant is] or [is] not disabled, blind, able to work, or able to perform regular or continuing work;

(ii)    Statements about whether or not [the claimant has] a severe impairment(s);

(iii)   Statements about whether or not [the claimant's] impairment(s) meet the duration requirement . . . ;

(iv)    Statements about whether or not [the claimant's] impairment(s) meets or medically equals any listing in the Listing of Impairments . . . ;

(v)     Statements about what [the claimant's] residual functional capacity is using [the SSA's] programmatic terms about the functional exertional levels . . . instead of descriptions about [the claimant's] functional abilities and limitations . . . ;

(vi)     Statements about whether or not [the claimant's] residual functional capacity prevents [the claimant] from doing past relevant work . . . ;

(vii)    Statements that [the claimant] [does] or [does] not meet the requirements of a medical-vocational rule . . . ; and

(viii)   Statements about whether or not [the claimant's] disability continues or ends when [the SSA] conduct[s] a continuing disability review.

*Id.* § 404.1520b(c)(3).

The regulations also provide that

[b]ecause a decision by any other governmental agency or a nongovernmental entity about whether [a claimant is] disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on [the SSA] and is not [its] decision about whether [the claimant is] disabled or blind under [SSA] rules.

*Id.* § 404.1504.   Therefore, the SSA "will not provide any analysis in [its] determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether [the claimant is] disabled, blind, employable, or entitled to any benefits." *Id.*  The SSA will, however, "consider all of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that [it] receive[s] as evidence in [a] claim . . . ." *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f).  Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed,

18

apart from [the claimant's] statements (symptoms)." *Id.* § 404.1502(g). Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.* Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques," which "include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X-rays), and psychological tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain:

> In determining whether [the claimant is] disabled, [the SSA will] consider all [the claimant's] symptoms, including pain, and the extent to which [the] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. [The SSA] will consider all [the claimant's] statements about [his or her] symptoms, such as pain, and any description [the claimant's] medical sources or nonmedical sources may provide about how the symptoms affect [the claimant's] activities of daily living and [his or her] ability to work.

*Id.* § 404.1529(a). But the SSA clarified that

statements about [the claimant's] pain or other symptoms will not alone

19

establish that [the claimant is] disabled.  There must be objective medical evidence from an acceptable medical source that shows [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence of [the claimant's] pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that [the claimant is] disabled.

*Id.*   Further, "[i]n evaluating the intensity and persistence of [the claimant's] symptoms, including pain, [the SSA] will consider all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements about how [the claimant's] symptoms affect [him or her]." *Id.*  The SSA will "then determine the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how [the claimant's] symptoms affect [his or her] ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, [it] will carefully consider any other information [the claimant] may submit about [his or her] symptoms." *Id.* § 404.1529(c)(3).  This other information may include "[t]he information that [the claimant's] medical sources or nonmedical sources provide about [the claimant's] pain or other symptoms," such as "what may precipitate or

20

aggravate [the claimant's] symptoms, what medications, treatments or other methods [the claimant uses] to alleviate them, and how the symptoms may affect [the claimant's] pattern of daily living," which "is also an important indicator of the intensity and persistence of [the claimant's] symptoms." *Id.*

> Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that [the claimant's] medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . . [The SSA] will consider all of the evidence presented, including information about [the claimant's] prior work record, [the claimant's] statements about [his or her] symptoms, evidence submitted by [the claimant's] medical sources, and observations by [the SSA's] employees and other persons.

*Id.* Factors relevant to a claimant's symptoms, such as pain, include:

(i) [D]aily activities;

(ii) The location, duration, frequency, and intensity of . . . pain or other symptoms;

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v) Treatment, other than medication, . . . received for relief of . . . pain or other symptoms;

(vi) Any measures . . . used to relieve . . . pain or other symptoms.

*Id.*

The new regulations also impose a duty on the claimant: "[i]n order to get

21

benefits, [the claimant] must follow treatment prescribed by [his or her] medical source(s) if this treatment is expected to restore [his or her] ability to work." *Id.* § 404.1530(a). Stated differently, "[i]f [the claimant does] not follow the prescribed treatment without a good reason, [the SSA] will not find [the claimant] disabled or, if [the claimant is] already receiving benefits, [the SSA] will stop paying . . . benefits." *Id.* § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1)  The specific medical treatment is contrary to the established teaching and tenets of [the claimant's] religion;

(2)  The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)  Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)  The treatment because of its magnitude (e.g., open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for [the claimant]; or

(5)  The treatment involves amputation of an extremity, or a major part of an extremity.

*Id.* § 404.1530(c).

## G.  Argument and Analysis

As stated above, Plaintiff raises three issues. First, Plaintiff argues the ALJ did not properly consider whether his impairments met or equaled Listing 12.03.

Second, Plaintiff argues the ALJ improperly discounted his mental health provider's opinion.  Third, Plaintiff argues the ALJ improperly evaluated his RFC.

### 1.     Listing 12.03

Plaintiff first argues the ALJ erred in failing to properly evaluate whether his impairments met or equaled Listing 12.03.   (ECF No. 12, PageID.2364).  Specifically, Plaintiff argues the ALJ improperly relied on his activities of daily living in addressing the functional requirements of Listing 12.03.   (*Id.* at PageID.2365).

The plaintiff has the burden to show that his impairments meet or medically equal a listed impairment.  *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 413 (6th Cir. 2011).

> The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the SSA considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. § 404.1525(a).  In other words, a claimant who meets the requirements of a Listed Impairment will be deemed conclusively disabled, and entitled to benefits.

*Id.* at 414.  Even where the ALJ's step three analysis is "quite cursory," a remand is unnecessary if the ALJ's decision, read as a whole, demonstrates sufficient consideration of the relevant evidence to allow for meaningful judicial review.  *Day v. Comm'r of Soc. Sec.*, No. 16-cv-12913, 2017 WL 4960178, at *3 (E.D. Mich. Sept. 28, 2017) (citing *Gower v. Comm'r of Soc. Sec.*, No. 13-cv-14511, 2015 WL

23

163830, at *9 (E.D. Mich. Jan. 13, 2015)).

Listing 12.03, dealing with schizophrenia and other psychotic disorders, is satisfied when either A and B below, or A and C below, are shown:

A. Medical documentation of *one* or more of the following:
    1. Delusions or hallucinations;
    2. Disorganized thinking (speech); or
    3. Grossly disorganized behavior or catatonia.
AND
B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F):
    1. Understand, remember, or apply information (see 12.00E1).
    2. Interact with others (see 12.00E2).
    3. Concentrate, persist, or maintain pace (see 12.00E3).
    4. Adapt or manage oneself (see 12.00E4).
OR
C. Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:
    1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); *and*
    2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.03.  A "marked" limitation means that the claimant's functioning in that area "independently, appropriately, effectively, and on a sustained basis is seriously limited" whereas an extreme limitation means the claimant has no ability to function in that area independently, appropriately, effectively, and on a sustained basis.  *Id.* § 12.00(F)(2).

24

As for the ALJ's paragraph B analysis, Plaintiff argues the ALJ relied solely on sporadic, low-demand activities performed in a controlled and highly supportive home environment with an ability to function. (ECF No. 12, PageID.2365).  Plaintiff also states, "The Sixth Circuit has repeatedly held that minimal daily activities—such as basic self-care, household chores, or occasional shopping—do not translate into the ability to sustain competitive employment, particularly in cases involving serious mental illness."  (*Id.* at PageID.2365–66).  In support of this assertion, Plaintiff cites only to *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248–49 (6th Cir. 2007).

*Rogers* is inapposite.  The discussion cited to in *Rogers* is evaluating the ALJ's discrediting of the plaintiff's testimony.  Moreover, it dealt with a plaintiff with fibromyalgia and her physical capacity.  The case has nothing to do with the proper standards for a paragraph B analysis or schizophrenia under step three.  Indeed, step three uses a higher standard than the statutory standard to find a claimant disabled because it operates as a presumption of disability.  *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990).

Additionally, Plaintiff mischaracterizes the ALJ's paragraph B analysis as minimal and reliant on only sporadic, low-demand activities, which is belied by a reading of the ALJ's analysis:

> In understanding, remembering, or applying information, the claimant has a mild limitation.  The claimant reported difficulty with his

memory. He also reported difficulty maintaining a normal thought process and the claimant's mother testified that he is unable to have organized thoughts. However, evaluation reported revealed no evidence of cognitive deficits. Also mental status findings revealed the claimant had normal fund of knowledge, normal recent and remote memory functioning, normal thought content, and normal insight and judgement. Also, the claimant testified that he writes music and did not report significant difficulty following written or spoken instructions. The evidence supports mild limitation in this area of functioning.

In interacting with others, the claimant has a moderate limitation. The claimant testified that he experiences social anxiety and has difficulty being around others. He testified that he experiences anxiety and stress when around others. However, he reportedly shops in stores and goes out daily. He also testified that he has friends and interacts with others on social media. Mental status findings showed the claimant was cooperative during evaluations and he did not demonstrate any abnormal behavior. The claimant also reported that he has no issues getting along with others, including figures of authority. The evidence supports moderate limitation in this area of functioing [sic].

With regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation. The claimant testified that he has difficulty concentrating and maintaining focus. However, he reported that he is able to pay attention for 8–10 minutes and is able to finish what he starts. Mental status findings mostly showed the claimant maintained intact concentration and attention. Also, the claimant reported that he writes music, which requires a level of concentration and focus. The evidence supports moderate limitation in this area of functioning.

As for adapting or managing oneself, the claimant has experienced a moderate limitation. The claimant reported no difficulty caring for his personal care needs, including bathing, grooming, and dressing. The claimant also reported being able to prepare simple meals and perform a variety of household chores. However, the claimant and his mother testified that he needs daily assistance and must live in a supportive environment. The claimant and his mother reported that he has difficulty handling stress and changes in routine. Mental status findings showed the claimant was alert and oriented during evaluations. While

26

> reports show the claimant received inpatient mental health treatment at St. Mary's Hospital in 2022, there is no evidence of recent hospitalizations nor any recent episodes of mental decompensation. The evidence supports moderate limitation in this area of functioning.
>
> Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

(ECF No. 9-1, PageID.43–44 (record citations omitted)).

In addition to Plaintiff's function reports, the ALJ relied on testimony, medical records, and evaluations in making the paragraph B findings. Plaintiff does not argue or show why this detailed paragraph B analysis is deficient except for his conclusory and unsupported declaration that the ALJ relied only on minimal functions. However, the block quote above shows that the ALJ relied on Plaintiff's activities as only a single point of evidence in a larger discussion of his abilities. Nor does he show that substantial evidence does not support the ALJ's findings. As such, Plaintiff has not met his burden of showing he has a marked limitation in two areas of functioning or an extreme limitation in one area of functioning. *See Bowman v. Comm'r of Soc. Sec.*, 683 F. App'x 367, 372 (6th Cir. 2017) ("When a claimant alleges his impairments meet or equal a listed impairment, he must present specific medical findings to satisfy the criteria of the particular listing.").

Plaintiff also relies on Cristi's medical opinion as evidence of having two marked limitations in areas of mental functioning. (ECF No. 12, PageID.2366–67). But Cristi did not opine Plaintiff was markedly limited in two of the four broad areas

27

of functioning.  Instead, she provided an opinion as to 20 specific restrictions within the four broad areas of functioning and found Plaintiff was only moderately limited in 15 of them and markedly limited in 5 of them.  (ECF No. 9-2, PageID.2227).  On balance, then, this opinion supports the conclusion that Plaintiff was only moderately limited in the four broad areas of functioning.

And the ALJ found the opinion "mostly persuasive" and explicitly "allowed for restrictions consistent with the moderate and marked specific findings reported." (ECF No. 9-1, PageID.48).  The ALJ thus included specific restrictions in the RFC aimed at the limitations Cristi opined Plaintiff had.  The only marked restriction the ALJ disagreed with was Cristi's opinion that Plaintiff had marked difficulties in social functioning.  (*Id.*).  The ALJ explained that although Plaintiff "is withdrawn, he reported that he has friends he socializes with, he spends time with his family, he is active on social media, he goes out regularly, and shops in stores.  A mere reluctance to leave the house does not implicate marked limitations in this domain by itself." (*Id.*).  But even if the ALJ erred in this conclusion—and even if that single conclusion would mean Plaintiff had a marked limitation in interacting with others— Plaintiff still would only have one broad area of functioning with a marked limitation, which is not enough to meet the requirements of Listing 12.03B for a minimum of marked limitations in *two* broad areas of functioning.  Plaintiff has therefore failed to show that he meets the criteria under Listing 12.03B.

28

As for paragraph C, Plaintiff argues that Cristi expressly opined that he had a residual disease process that resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause him to decompensate. (ECF No. 9-2, PageID.2225). Again, although the ALJ found Cristi's opinion mostly persuasive, the ALJ found this specific opinion was not supported by nor consistent with the medical evidence of record:

> findings that even marginal adjustment would cause decompensation are not particularly supported by statements that the claimant has reduced concentration, focus, and social interaction. Findings that the claimant has been in a highly supportive living arrangement simply because he has been living with his family is correlation without a finding of causation. A highly supportive living environment is not simply living with family. In this regard, I note the claimant reported that he has no problems caring for his personal care needs, and he reported that he manages his own medications, keeps track of his own funds, and he attends social gatherings with friends.

(ECF No. 9-1, PageID.48).

In general, the SSA will consider certain supports and living arrangements in evaluating whether a claimant is disabled:

> Psychosocial supports, structured settings, and living arrangements, including assistance from your family or others, may help you by reducing the demands made on you. In addition, treatment you receive may reduce your symptoms and signs and possibly improve your functioning, or may have side effects that limit your functioning. Therefore, when we evaluate the effects of your mental disorder and rate the limitation of your areas of mental functioning, we will consider the kind and extent of supports you receive, the characteristics of any structured setting in which you spend your time, and the effects of any

treatment.    This evidence may come from reports about your functioning from you or third parties who are familiar with you, and other third-party statements or information.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(1); *see also Cooney v. Calvin*, No. 14-cv-59, 2015 WL 632312, at *8 (W.D. Ky. Feb. 13, 2015) ("[A] highly supportive living environment is typically associated with conditions similar to those found in a hospital, halfway house, or board and care facility."). As relevant to Plaintiff's arguments here, the SSA gives as an example that claimants may "receive help from family members or other people who monitor [their] daily activities and help [them] to function. For example, family members administer [their] medications, remind [them] to eat, shop for [them] and pay [their] bills, or change their work hours so [the claimant is] never home alone." *Id.*

Plaintiff's own report belies that his living situation is such that it equates to a highly structured setting pursuant to paragraph C. As the ALJ discussed, Plaintiff "has no problems caring for his personal care needs, and he reported that he manages his own medications, keeps track of his own funds, and he attends social gatherings with friends." (ECF No. 9-1, PageID.48 (citing *id.*, PageID.263–71, 281–88)). These are things SSA regulations explicitly consider in determining whether a living environment is highly supportive and it was appropriate for the ALJ to consider them as one factor in determining Plaintiff was not disabled. *Accord John J. v. Comm'r of Soc. Sec.*, No. 24-cv-461, 2024 WL 5001406, at *6–*8 (S.D. Ohio Dec. 6, 2024)

(discussing plaintiff's structural support and similar activities of daily living in concluding he was not disabled), *report and recommendation adopted*, 2025 WL 99775 (S.D. Ohio Jan. 15, 2025).

In addition, the ALJ discussed that "mental status examination findings during the period at issue do not support the finding of only minimal capacity in this area, including those noting normal mood, affect, cognition, judgment, insight, and behavior. The claimant also exhibited the ability to testify at the disability hearing." (ECF No. 9-1, PageID.44). The ALJ concluded, "All of these activities indicate more than a minimal capacity to adapt to changes or demands." (*Id.*). Finally, Plaintiff argues the ALJ made a conclusory finding that Listing 12.03 was not met. As discussed above, he did not. Because substantial evidence supports the ALJ's findings, this Court should not disturb them even if it would have found differently. *Chizamonique W. v. Comm'r of Soc. Sec.*, No. 25-cv-10252, 2026 WL 867596, at *7 (E.D. Mich. Mar. 30, 2026).

### 2. Medical Opinion

Plaintiff next argues the ALJ improperly discounted the opinion of his treating provider, Cristi. (ECF No. 12, PageID.2369). Specifically, he argues the ALJ discounted the most consequential portions of her opinion and improperly substituted his own lay opinion. (*Id.* at PageID.2370).

As a refresher, the SSA "will not defer or give any specific evidentiary weight,

31

including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a). An ALJ must explain his or her approach with respect to supportability and consistency when considering a medical opinion. *Id*. § 404.1520c(b). For supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id*. § 404.1520c(c)(1). For consistency, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id*. § 404.1520c(c)(2). Importantly, the ALJ is "not required to articulate how [he or she] considered evidence from nonmedical sources using the requirements" above. *Id*. § 404.1520c(d).

These regulations are less demanding than the former rules, but they still require the ALJ to provide a "minimum level of articulation" coherently explaining his or her reasoning. *Hardy v. Comm'r of Soc. Sec.*, 554 F. Supp. 3d 900, 906 (E.D. Mich. 2021) (quotation omitted). The court reviews the ALJ's decision and the record as a whole, but it is not the court's job to comb through the record and imagine

32

ways the ALJ could have applied the factors to the evidence.  *Id.* at 908–09.

Plaintiff's argument substantially overlaps with his argument above and, to that extent, will not be discussed further here.  In addition to these repetitive arguments, Plaintiff also appears to contend that an ALJ must identify a contrary medical opinion in order to discredit his preferred medical opinion.  (ECF No. 12, PageID.2371).  But while an ALJ may not be able to substitute his opinion for a medical doctor's "when there is no competing evidence," *Grecol v. Halter*, 46 F. App'x 773, 777 (6th Cir. 2002), the ALJ "need not base the RFC determination on a medical opinion."  *Trina H. v. Comm'r of Soc. Sec.*, No. 22-cv-338, 2023 WL 4405755, at *7 (S.D. Ohio July 7, 2023) (collecting cases); *Hayward v. Comm'r of Soc. Sec.*, No. 14-cv-14613, 2015 WL 7749173, at *8 (E.D. Mich. Sept. 21, 2015) ("[A]n ALJ is not required to adopt a specific medical decision in support of his decision.").  Instead, the question is whether substantial evidence supports the ALJ's decision, as it does here.

Finally, Plaintiff argues the ALJ's decision is internally inconsistent because the ALJ used Cristi's opinion to justify some RFC limitations in social interaction and concentration while also rejecting her findings that those limitations rise to a marked level.  (ECF No. 12, PageID.2371).  There is nothing inconsistent with finding that an opinion is *partially* supported by and consistent with the medical evidence.  An ALJ may reasonably find an opinion is partially persuasive in that the

33

claimant would have some limitations while also finding that the *extent* of the limitations are not as severe as opined. Thus, Plaintiff has not shown error.

### 3. RFC

Finally, Plaintiff argues the ALJ's RFC assessment is not supported by substantial evidence. (ECF No. 12, PageID.2371). Specifically, Plaintiff argues the RFC "failed to account for [his] documented inability to tolerate stress, difficulty adapting to change, impaired concentration and focus, and history of repeated decompensation." (*Id.* at PageID.2372).

But the ALJ explicitly considered these limitations in the RFC:

However, records do reflect deficits in the claimant's concentration, social interaction, and ability to handle stressful situations. The claimant and his mother also testified that he has difficulty with organized thought processing and completing more complex tasks; and further testified that the claimant experiences some anxiety when around others. Such deficits could reasonably affect the claimant's ability to perform tasks, interact with others in the workplace, concentrate and attend for long periods, and tolerate changes in the workplaces. *These mental deficits have been accounted for in the assigned residual functional capacity*, with a limitation to simple work, with short simple instructions and no production rate paced worked; as well as a limitation to work requiring simple work-related decisions. Considering the claimant's history of schizophrenia symptomology and his reports of experiencing paranoia and anxiety when in social settings, the claimant is limited to no more than occasional interaction with coworkers and supervisors, and limited to work requiring no interaction with the public. Also, considering his difficulty handling stressful situations and managing changes in routine, he is able to tolerate no more than occasional changes in the routine work setting. Nonetheless, no additional limitations are supported beyond those outlined in the assigned residual functional capacity, particularly given the relatively normal mental status exams and reports during the time period in

question; and considering the claimant's ability to perform a variety of daily activities independently, as well as his own reports of being able to socialize with others, shop in stores, and get along with others.

(ECF No. 9-1, PageID.46–47 (emphasis added)). As for Plaintiff's decompensation, the ALJ discussed that his condition had improved since his last hospitalization because he had remained on his prescribed medications and his mental status exams since then have been generally normal. (*Id.* at PageID.46). Plaintiff's alleged errors were explicitly discussed, and he fails to "explain what other restrictions should have been incorporated or point to medical evidence to substantiate any additional restrictions." *Bonds v. Comm'r of Soc. Sec.*, No. 13-cv-13846, 2015 WL 791271, at *4 (E.D. Mich. Feb. 25, 2015).

Plaintiff also argues the record demonstrates his symptoms predictably worsen under stress or increased demands, and thus reliance on temporary stability is legally insufficient. (ECF No. 12, PageID.2373). But again, Plaintiff fails to cite to the record to support his burden. Instead, the Undersigned's review shows that Plaintiff decompensates when he decides to go off his medications or self-medicates with cannabis but that he is demonstrably better when he takes only his prescribed medications as directed. Similarly, Plaintiff argues his most severe hospitalization came after discontinuing medication in order to increase his level of functioning so he could work. (*Id.* at PageID.2374). But the evidence does not show he is unable to function on his medications. The evidence shows the opposite; when Plaintiff

35

takes his medication, he has the abilities described in the ALJ's RFC which would allow for the work described in step five.

Plaintiff's claims of cherry picking similarly fail.  Claims of cherry-picking record evidence rarely succeed: "the same process can be described more neutrally as weighing the evidence." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009); *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014) (crediting argument of cherry picking requires court to re-weigh record evidence). Here, "[t]o be sure, there was evidence in the record from which a reasonable person could conclude that [Plaintiff] was disabled.  But the relevant inquiry is whether substantial evidence supports the ALJ's decision." *Adams v. Comm'r of Soc. Sec.*, No. 23-3284, 2023 WL 6366106, at *4 (6th Cir. Sept. 28, 2023).  The ALJ did not ignore evidence of Plaintiff's prior hospitalizations.  Instead, the ALJ weighed the evidence and found Plaintiff could sustain work with the limitations found in the RFC now that he was back on his medications long-term.  As this conclusion is supported by substantial evidence, the ALJ's decision should be affirmed.

**H.      Conclusion**

The ALJ properly weighed the evidence and supported his findings with substantial evidence. Therefore, Plaintiff's motion for summary judgment (ECF No. 12) should be **DENIED** and the Commissioner's motion for summary judgment (ECF No. 15) should be **GRANTED**.

## III.    REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.  A party may respond to another party's objections within 14 days after being served with a copy."  Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this R&R.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this R&R to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address

37

each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: May 20, 2026

S/PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge